# NO. 12-13-00359-CV

# IN THE COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT

# TYLER, TEXAS

| | | |
|---|---|---|
| *IN THE INTEREST OF* | *§* | *APPEAL FROM THE* |
| *K. G. AND A. G.,* | *§* | *COUNTY COURT AT LAW* |
| *CHILDREN* | *§* | *CHEROKEE COUNTY, TEXAS* |

### *MEMORANDUM OPINION*

J.W. appeals the termination of her parental rights. In five issues, she challenges the order of termination. We affirm.

### BACKGROUND

J.W. is the mother of K.G., born March 22, 2007, and A.G., born June 2, 2009. R.G. is the father of the children and is not a party to this appeal. On September 5, 2012, the Department of Family and Protective Services (the Department) filed an original petition for protection of the children, for conservatorship, and for termination of J.W.'s parental rights. The Department was appointed temporary managing conservator of the children, and J.W. was appointed temporary possessory conservator with limited rights and duties.

At the conclusion of the trial on the merits, the trial court found, by clear and convincing evidence, that J.W. had engaged in one or more of the acts or omissions necessary to support termination of her parental rights. The trial court also found that termination of the parent-child relationship between J.W., K.G., and A.G. was in the children's best interest. Based on these findings, the trial court ordered that the parent-child relationship between J.W., K.G., and A.G. be terminated. This appeal followed.

## TERMINATION OF PARENTAL RIGHTS

Involuntary termination of parental rights embodies fundamental constitutional rights. ***Vela v. Marywood***, 17 S.W.3d 750, 759 (Tex. App.–Austin 2000), *pet. denied per curiam*, 53 S.W.3d 684 (Tex. 2001); ***In re J.J.***, 911 S.W.2d 437, 439 (Tex. App.–Texarkana 1995, writ denied). Because a termination action "permanently sunders" the bonds between a parent and child, the proceedings must be strictly scrutinized. ***Wiley v. Spratlan***, 543 S.W.2d 349, 352 (Tex. 1976); ***In re Shaw***, 966 S.W.2d 174, 179 (Tex. App.–El Paso 1998, no pet.).

Section 161.001 of the family code permits a court to order termination of parental rights if two elements are established. TEX. FAM. CODE ANN. § 161.001 (West 2014); ***In re J.M.T.***, 39 S.W.3d 234, 237 (Tex. App.–Waco 1999, no pet.). First, the parent must have engaged in any one of the acts or omissions itemized in the first subsection of the statute. TEX. FAM. CODE ANN. § 161.001(1) (West 2014); ***Green v. Texas Dep't of Protective & Regulatory Servs.***, 25 S.W.3d 213, 219 (Tex. App.–El Paso 2000, no pet.); ***In re J.M.T.***, 39 S.W.3d at 237. Second, termination must be in the best interest of the child. TEX. FAM. CODE ANN. § 161.001(2) (West 2014); ***In re J.M.T.***, 39 S.W.3d at 237. Both elements must be established by clear and convincing evidence, and proof of one element does not alleviate the petitioner's burden of proving the other. TEX. FAM. CODE ANN. § 161.001; ***Wiley***, 543 S.W.2d at 351; ***In re J.M.T.***, 39 S.W.3d at 237.

The clear and convincing standard for termination of parental rights is both constitutionally and statutorily mandated. TEX. FAM. CODE ANN. § 161.001; ***In re J.J.***, 911 S.W.2d at 439. Clear and convincing evidence means "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE ANN. § 101.007 (West 2014). The burden of proof is upon the party seeking the deprivation of parental rights. ***In re J.M.T.***, 39 S.W.3d at 240.

## STANDARD OF REVIEW

When confronted with both a legal and factual sufficiency challenge, an appellate court must first review the legal sufficiency of the evidence. ***Glover v. Tex. Gen. Indem. Co.***, 619 S.W.2d 400, 401 (Tex. 1981); ***In re M.D.S.***, 1 S.W.3d 190, 197 (Tex. App.–Amarillo 1999, no pet.). In conducting a legal sufficiency review, we must look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its findings were true. ***In re J.F.C.***, 96 S.W.3d 256, 266 (Tex. 2002). We must assume that the fact finder settled disputed facts in favor of its finding if a reasonable fact

finder could do so and disregard all evidence that a reasonable fact finder could have disbelieved or found incredible. *Id*.

The appropriate standard for reviewing a factual sufficiency challenge to the termination findings is whether the evidence is such that a fact finder could reasonably form a firm belief or conviction about the truth of the petitioner's allegations. *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002). In determining whether the fact finder has met this standard, an appellate court considers all the evidence in the record, both that in support of and contrary to the trial court's findings. *Id*. at 27-29. Further, an appellate court should consider whether disputed evidence is such that a reasonable fact finder could not have reconciled that disputed evidence in favor of its finding. *In re J.F.C.*, 96 S.W.3d at 266. The trier of fact is the exclusive judge of the credibility of the witnesses and the weight to be given their testimony. *Nordstrom v. Nordstrom*, 965 S.W.2d 575, 580 (Tex. App.–Houston [1st Dist.] 1997, pet. denied).

### TERMINATION UNDER SECTION 161.001(1)(E)

In her third and fourth issues, J.W. argues that the evidence is legally and factually insufficient to support a finding that she engaged in conduct, or knowingly placed the children with persons who engaged in conduct, that endangered their physical or emotional well being.

**Applicable Law**

The court may order termination of the parent-child relationship if it finds by clear and convincing evidence that the parent has engaged in conduct, or knowingly placed the child with persons who engaged in conduct, that endangers the physical or emotional well being of the child. TEX. FAM. CODE ANN. § 161.001(1)(E) (West 2014). The specific danger to the child's well being need not be established as an independent proposition, but may instead be inferred from parental misconduct. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *In re J.J.*, 911 S.W.2d at 440. Scienter is not required for an appellant's own acts under Section 161.001(1)(E), although it is required when a parent places her child with others who engage in endangering acts. *In re U.P.*, 105 S.W.3d 222, 236 (Tex. App.—Houston [14th Dist.] 2003, pet. denied). Finally, the need for permanence is a paramount consideration for the child's present and future physical and emotional needs. *In re N.K.*, 99 S.W.3d 295, 301 n.9 (Tex. App.—Texarkana 2003, no pet.); *In re M.D.S.*, 1 S.W.3d at 200.

"Endanger" means to expose to loss or injury or to jeopardize. *Boyd*, 727 S.W.2d at 533; *In re D.M.*, 58 S.W.3d 801, 811 (Tex. App.—Fort Worth 2001, no pet.). It is not necessary that the

3

conduct be directed at the child or that the child actually suffers injury. ***Boyd***, 727 S.W.2d at 533; ***In re J.J.***, 911 S.W.2d at 440. Subsection (E) requires us to look at the parent's conduct alone, including actions, omissions, or the parent's failure to act. ***In re D.J.***, 100 S.W.3d 658, 662 (Tex. App.—Dallas 2003, pet. denied); ***In re D.M.***, 58 S.W.3d at 811. Termination under subsection (E) must be based on more than a single act or omission. ***In re D.M.***, 58 S.W.3d at 812; ***In re D.T.***, 34 S.W.3d 625, 634 (Tex. App.—Fort Worth 2000, pet. denied). A voluntary, deliberate, and conscious "course of conduct" by the parent that endangers the child's physical and emotional well being is required. ***In re D.M.***, 58 S.W.3d at 812; ***In re D.T.***, 34 S.W.3d at 634.

A parent's use of narcotics and its effect on her ability to parent may qualify as an endangering course of conduct. ***In re J.O.A.***, 283 S.W.3d 336, 345 (Tex. 2009); *see also **In re R.W.***, 129 S.W.3d 732, 739 (Tex. App.—Fort Worth 2004, pet. denied). Further, a parent's illegal drug use can support termination for endangerment because it exposes the children to the possibility that the parent may be impaired or imprisoned. ***Melton v. Tex. Dep't of Family & Protective Servs.***, No. 03-08-00168-CV, 2010 WL 668917, at *5 (Tex. App.—Austin Feb. 25, 2010, no pet.) (mem. op.). A fact finder may also reasonably infer from a parent's repeated failure to attend scheduled drug screenings that the parent was avoiding testing because the parent was using drugs. ***In re W.E.C.***, 110 S.W.3d 231, 239 (Tex. App.—Fort Worth 2003, no pet.). A parent's repeated engagement in illegal drug activity after agreeing not to do so in a service plan for reunification with her children may be considered in an analysis of whether clear and convincing proof exists of voluntary, deliberate, and conscious conduct that endangered the well being of her children. ***In re T.N.***, 180 S.W.3d 376, 383 (Tex. App.—Amarillo 2005, no pet.). A parent's decision to engage in illegal drug use during the pendency of a termination suit, when the parent is at risk of losing her children, may also support a finding that the parent engaged in conduct that endangered the children's physical or emotional well being. ***In re M.E.-M.N.***, 342 S.W.3d 254, 263 (Tex. App.—Fort Worth 2011, pet. denied).

As a general rule, conduct that subjects a child to a life of uncertainty and instability endangers the physical and emotional well being of a child. ***In re M.R.J.M.***, 280 S.W.3d 494, 503 (Tex. App.—Fort Worth 2009, no pet.); ***In re R.W.***, 129 S.W.3d at 739. Evidence of criminal conduct, convictions, and imprisonment and its effect on a parent's life and ability to parent may establish an endangering course of conduct. ***In re S.M.***, 389 S.W.3d 483, 492 (Tex. App.—El Paso 2012, no pet.). Imprisonment alone does not constitute an endangering course of conduct, but it is a fact properly considered on the endangerment issue. ***Id.*** (citing ***Boyd***, 727 S.W.2d at 533-

4

34). Conduct that routinely subjects children to the probability that they will be left alone because the parent is once again jailed, whether because of the continued violation of supervisory conditions or because of a new offense growing out of a continued use of illegal drugs, endangers both the physical and emotional well being of the children. *See In re S.D.*, 980 S.W.2d 758, 763 (Tex. App.—San Antonio 1998, pet. denied).

## Analysis

The evidence at trial demonstrated that this case began in August 2012. At that time, the children, K.G. and A.G., were living with J.W.'s mother under a safety plan signed by J.W. in August 2012. LaWanda Tucker, a conservatorship worker for the Department, testified that the children were removed from J.W.'s mother because of drug use and domestic violence. More specifically, she said, J.W. tested positive for cocaine in September 2012 through a hair follicle drug test. Tucker also stated that "family members" were not appropriate because J.W.'s mother used marijuana while taking care of the children. She said that at the time of the children's removal, there were allegations of physical and verbal confrontations between J.W. and her mother in the presence of the children.

### *Drug Use*

Tucker admitted that J.W.'s drug use could have predated the September 2012 positive test by three months. However, J.W. admitted to Tucker that she used cocaine in September 2012. At trial, J.W. denied knowing why she tested positive for cocaine in September 2012, although she admitted using cocaine in March 2012 and methamphetamine in June 2012. She used cocaine in March because her brother "subjected" her to drugs. J.W. admitted that her children were living with her, but said they were outside playing or were not at home when she used drugs. At another point in her testimony, J.W. stated that she was not at home when she used drugs. Instead, she testified, she used drugs at a friend's house while the children were at home with their father.

J.W. was initially cooperative with the Department until she was asked to submit to random drug testing. Tucker testified that she asked J.W. to take drug tests "very often," i.e., more than five times. However, she said, J.W. always had an excuse as to why she could not be tested that day. J.W. denied ever refusing a drug test. She said that when she was ordered to submit to drug testing on October 5, 2012, the drug testing facility was out of hair follicle tests. When she went back a week later, the drug tester was sick. J.W. submitted to drug testing in February 2013, and tested positive for methamphetamine. She denied buying the methamphetamine, but stated that a friend of her brother's gave it to her.

*Criminal Activity*

J.W. was arrested on November 30, 2012, for hindering secured creditors and on December 20, 2012, for hindering apprehension or prosecution. She was in jail from November 30 through December 28, 2012. Tucker believed that these cases were dismissed.

J.W. was arrested in Cherokee County on March 21, 2013, for possession of a controlled substance and possession of a dangerous drug. She explained that she traveled by bus from Corpus Christi, Texas to Cherokee County in March to get some of her things from her sister's house. She was in the area for a few days, "cruising" and "hanging" around, and reportedly stayed at numerous friends' houses. While staying at a friend's house, the friend gave her methamphetamine. J.W. denied using the methamphetamine and stated that she was going to "get rid of it." She stated that the pills found inside her bag were not hers and that she did not realize they were there.

The offense report also indicated that she and her boyfriend had a verbal and physical altercation. She pleaded guilty to this offense, was released from jail on July 27, 2013, and was on community supervision at the time of trial. She also admitted that she was arrested in 2006 for possession of a dangerous drug.

Tucker stated that J.W. made "poor choices" in her friends, i.e., a boyfriend with whom she was arrested in 2013. That boyfriend was in the courtroom at the time of trial, indicating to Tucker that their relationship continued. J.W. was "not sure" if he had a felony conviction.

*Domestic Violence*

According to J.W., her mother "would tell you" that they had a physical altercation in September 2012. J.W. testified that two weeks after she signed the August 20 safety plan, she attempted to pick up her children. She said that her mother locked the door and would not let her near the children. Although she wanted to exchange the children outside, her mother insisted that she come inside the house. J.W. went inside her mother's house, picked up both children, and turned towards the living room. She stated that her mother attempted to "rip them out of [her] arms." Her older child "got down," and she continued to hold her younger child. At that point, she said, her mother "just lost it." She denied kicking and pushing her mother, but stated that her mother pushed her and her younger child's back hit the back of the couch. J.W. denied calling the police.

6

*Stability of J.W.'s Home*

J.W. testified that she lived in Jacksonville, Texas, with her children from September 1, 2011, to September 2012, when the children were placed in foster care. During the summer of 2012, the children's father moved to the Dallas area. After the children were removed from her mother, J.W. moved to Irving to live with an ex-boyfriend's brother and cleaned houses. As noted above, J.W. was in jail from November 30 to December 28, 2012. In January 2013, she moved to another address in Irving and lived with another friend for about a month. J.W. had to leave when her friend decided to let his ex-girlfriend move back. She gave Tucker the two home addresses in the Dallas area, but Tucker did not visit either place.

From February 2013 to March 2013, she lived in the Corpus Christi area with her brother, and worked at a lodge. According to Tucker, she never received a pay stub verifying that J.W. was employed. In March 2013, J.W. went to jail until July 27. She went to live with her sister after being released from jail. Her sister's household included her sister's boyfriend, her sister's son, and her sister's "in-laws." J.W. said that the house had three bedrooms and one bathroom. She stated that she would begin working at a fast food restaurant after trial. According to Tucker, J.W. did not have a stable home because she did not stay in one place.

*The Children*

Tucker stated that in October 2012, J.W. began visiting the children once a week, and that she drove from the Dallas metropolitan area in order to do so. Tucker observed several visits between J.W. and the children and reported that the visits "went well." J.W. and the children were bonded and their weekly visits were healthy for the children.

In December 2012, the children were taken from foster care and placed with a family member, an aunt, near Corpus Christi. J.W. stated that she saw the children frequently after she moved near them in February 2013. She was unaware that this was in violation of Department rules or court orders. She denied that she slept on her sister's front porch and refused to leave. Tucker stated that in the summer of 2013, the aunt moved without informing the Department. At that time, the Department did not know where the children were located, but Tucker suspected they were with J.W.'s mother. The Department located the children at J.W.'s mother's home, and on July 30, the children were removed and placed in foster care. Afterwards, J.W. contacted Tucker, stating that she had been released from jail on July 27, and visited the children before they were removed to foster care.

According to Tucker, the children have no special needs and, in her opinion, they should be easily adopted. She also stated that they are doing "fine" in their current foster care placement. Tucker believed that J.W. was not willing to make her children a priority and take the necessary steps to provide them with a safe environment. J.W. admitted that she caused the turmoil to which her children had been subjected over the past fifteen to sixteen months. She stated that being a parent means having a stable home, employment, transportation, emotional support, and the financial ability to take care of their needs. J.W. agreed that she had been unable to do those things over the last year, but insisted that she had the ability to do so. She stated that she loved her children and that they loved her.

*Service Plan*

J.W. agreed to a service plan in September 2012, which included parenting classes, Narcotics Anonymous and Alcoholics Anonymous meetings, counseling, maintaining a stable home and income, submitting to random drug testing, attending anger management, and not using illegal drugs. J.W. did not complete anger management, parenting classes, or counseling, and admitted that she did not complete any of her service plan. She stated at the time of trial that she had been trying to start parenting classes and counseling and to enter a rehabilitation facility.

## Conclusion

Viewing the evidence in the light most favorable to the finding, the trial court could have determined that J.W. admitted she used drugs while the children were in her care, failed to submit to random drug testing at least five times, and tested positive for drugs after the children were removed from her care. She also moved in with her brother in February 2013 after stating that he had earlier "subjected" her to drugs. J.W.'s actions exposed the children to the possibility that she might be impaired or imprisoned. *See Melton*, 2010 WL 668917, at \*5. The trial court could have inferred from her repeated failures to attend random drug tests that she avoided testing because she was using drugs. *See In re W.E.C.*, 110 S.W.3d at 239. Because J.W. decided to use illegal drugs after she agreed not to do so in her service plan and during the pendency of this case, the trial court could have considered J.W.'s decision in its finding that she engaged in conduct that endangered the children's physical or emotional well being. *See In re M.E.-M.N.*, 342 S.W.3d at 263; *In re T.N.*, 180 S.W.3d at 383.

The evidence also demonstrated that J.W.'s home life was chaotic, revealing possible domestic violence between J.W., her mother, and a former boyfriend; numerous short term moves during the pendency of this case to stay with "friends" or a brother who "subjected" her to drugs;

possible violations of Department rules and court orders when visiting her children; and possible community supervision violations because of her current relationship with a former boyfriend. J.W.'s repeated incarcerations, continued illegal drug use, unstable home life, and possible domestic violence subjected the children to a life of uncertainty and instability that endangered their physical and emotional well being. *See In re M.R.J.M.*, 280 S.W.3d at 503; *In re R.W.*, 129 S.W.3d at 739.

However, J.W. stated that she loved her children, that she was living with her sister, that she had found employment, and that she was attempting to complete her service plan and enter a rehabilitation facility. Tucker admitted that visitations between J.W. and the children "went well" and that they were bonded. Although this evidence conflicts with the trial court's findings, it is not so significant that a reasonable trier of fact could not have reconciled this evidence in favor of its finding and formed a firm belief or conviction that J.W. engaged in conduct, or knowingly placed the children with persons who engaged in conduct, that endangered their physical or emotional well being. Therefore, we hold that the evidence is legally and factually sufficient to support termination of J.W.'s parental rights under Section 161.001(1)(E). Accordingly, we overrule J.W.'s third and fourth issues regarding Section 161.001(1)(E).

## DISPOSITION

Having overruled J.W.'s third and fourth issues, we ***affirm*** the judgment of the trial court.[1]

JAMES T. WORTHEN
Chief Justice

Opinion delivered May 14, 2014.
*Panel consisted of Worthen, C.J., Griffith, J., and Hoyle, J.*

(PUBLISH)

---

[1] Because we have concluded that the evidence is legally and factually sufficient to support termination of J.W.'s parental rights under subsection (1)(E), we need not address J.W.'s first, second, and fourth issues regarding subsections (1)(D) or (1)(O). *See* TEX. FAM. CODE ANN. § 161.001(1); TEX. R. APP. P. 47.1. J.W. does not dispute the trial court's finding that termination was in the best interest of the children. *See* TEX. FAM. CODE ANN. § 161.001(2).



# COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT OF TEXAS

# JUDGMENT

**MAY 14, 2014**

**NO. 12-13-00359-CV**

**IN THE INTEREST OF K. G. AND A. G., CHILDREN**

Appeal from the County Court at Law

of Cherokee County, Texas (Tr.Ct.No. 2012-09-0648)

THIS CAUSE came to be heard on the appellate record and briefs filed herein, and the same being considered, it is the opinion of this court that there was no error in the judgment.

It is therefore ORDERED, ADJUDGED and DECREED that the judgment of the court below **be in all things affirmed**, and that this decision be certified to the court below for observance.

James T. Worthen, Chief Justice.
*Panel consisted of Worthen, C.J., Griffith, J., and Hoyle, J.*